99 747
101 808
99 747
102 275
99 747
105 724

# Richmond.

MILLER v. BLACK ROCK SPRINGS IMPROVEMENT COMPANY.

NOVEMBER 21, 1901.

1. CHANCERY PLEADING—*Demurrer—Failure to Pass On.*—A demurrer to a bill of which no disposition seems to have been made will be regarded as overruled.

2. SUB-SURFACE WATER—*Percolations—Ownership—Right to Intercept.*— Sub-surface waters which merely percolate, ooze, or filter through the soil, and which do not flow in any permanent, distinct, or definite channel, belong to the owner of the soil, and pass with it just as the rocks and ores beneath the surface pass. In the absence of malice or negligence, the owner may appropriate them to his own use, and if, in so doing, such waters are diverted from the lands of the adjacent proprietor, it is *damnum absque injuria.*

3. SUB-SURFACE WATERS—*Case in Judgment—Interception of Water.*—In the case in judgment the appellant, in order to procure water for his own use, dug a ditch on his own land, near the line of the appellee, in consequence of which the water, which had formerly flowed through unknown and indistinct channels into appellee's spring just across the line, was diverted, and thereafter percolated into the ditch and flowed through the lands of the appellant. Neither malice nor negligence being established, it was held that appellant had not exceeded his rights in digging the ditch.

4. SUB-SURFACE WATER—*Well-Defined Stream—Use by Upper Proprietor.*—Although a spring on the land of one person is supplied by a well-defined stream of water, coming through the land of another, the latter is entitled to a reasonable use of the water on his own land.

Appeal from a decree of the Circuit Court of Augusta county, pronounced July 3, 1901, in a suit in chancery, wherein the appellee was the complainant, and the appellant was the defendant.

*Reversed.*

The opinion states the case.

*Grattan & Grattan* and *J. A. Glasgow*, for the appellant.

*Patrick & Gordon*, for the appellee.

CARDWELL, J., delivered the opinion of the court.

The bill in this case, filed by appellee, a corporation and the complainant in the court below, alleges that it and the defendant below, appellant here, are the owners of two adjoining tracts of land lying on the slope of the Blue Ridge Mountains, near the dividing line between the counties of Rockingham and Augusta, the property of each being used as a summer resort or watering-place; that soon after appellee was incorporated and purchased its tract of land, a question arose between it and appellant as to the ownership of two springs, the smaller one a mineral spring, situated near the dividing line between the two properties; that litigation was the result of this controversy, and it was finally decided that the springs were upon the land of appellee, and appellant was restrained by injunction, in 1893, from using the water from the springs, &c.; and that thereafter appellant made several fruitless efforts to secure the use of these waters for his boarding-house and his guests. The bill then concludes as follows: "Finding that he had finally to give up the use of these waters by open means above the surface, Miller (appellant) has recently undertaken to tap the springs by a ditch along close to the line between the two properties, which digging has been done in the county of Augusta.

"By this means he has crossed the sources of one of the springs and turned it into the ditch he has dug and carried it down to his own property. So much so that the spring has almost entirely ceased to flow, and your orator is advised that he is going

on in his search for the other one. This is not only an invasion of your orator's property rights in the diversion of water whose natural flow is on the lands of the orator's property, as it is at present used, but an almost absolute destruction of its value for any purpose if this water is allowed to be taken away. The injury thus worked to your orator would be irreparable," &c. The prayer is for an injunction to restrain appellant, his agent, &c., "from digging on his own land so as to strike the sources of the springs which rise on appellee's land, or from in any way reducing the flow of the water that would naturally flow out at the springs, or from in any way interfering with appellee's use of said water, whether above or below the ground; that he (appellant) may be required peremptorily at once, and if he does not do so promptly, that complainant may be permitted to go on his premises and fill in the ditch that he has already dug, so as to restore said stream, if it can possibly be done, to its natural flow," &c.

Appellant demurred to and answered the bill, and in his answer admits the former litigation concerning the spring in question, resulting in an injunction restraining him from using the water therefrom, and that he did dig upon his own land to obtain water, but claims that he was simply doing what he had a perfect right to do; that he was not seeking to cut off the sources of any spring on appellee's land; that he did not know and could not tell where the water which flowed from appellee's spring came from, but if it be true, as appellee infers, that it comes from appellant's land, he will certainly be allowed a reasonable use of waters flowing through his land, whether above or below the surface, &c. He further claims that he does not know, neither can any one say where are the sources of these springs other than the springs themselves, and that the digging he did on his own land was not done to vex appellee, or with malice and intent to injure its property, but was simply done

in the exercise of his lawful rights on his own soil, in order to procure water for his own use.

No disposition seems to have been made of the demurrer to the bill, and it is to be regarded as overruled (*Miller* v. *Miller*, 92 Va., 196), but this does not constitute error, as the bill upon its face states a case for equity jurisdiction.

Upon hearing the cause upon the bill and answer and the depositions of witnesses, the Circuit Court, being of opinion that the nature and extent of the digging complained of in the bill was not plainly shown by the evidence, ordered that the complainant (appellee) take further evidence on this point. Whereupon, only the deposition of C. S. Patterson, president of the appellee company, who had twice before testified in the cause, was taken, and upon a final hearing the decree appealed from was made, perpetuating the temporary injunction.

A great number of cases have been considered by this court involving the correlative rights of adjoining owners of land in reference to running streams on the surface, but the question presented in this case has not heretofore been considered.

In *Frazier* v. *Brown*, 12 Ohio St. 294, the facts were almost identical with those appearing in this record, and in an able and exhaustive opinion, concurred in by the entire court, it was held (1), that in the absence of express contract and positive legislation, as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing, or filtering through the earth; hence, where a landowner digs a "hole" on his own land for purposes connected with the use of his own land, thereby cutting off or diverting underground waters which have always been accustomed to percolate or ooze through his land to the land of an adjoining proprietor, and there form the source of a spring or rivulet, any damage thereby occasioned to such adjoining proprietor is *damnum absque injuria;* (2) the act, to-wit, the *use* of his own property, being lawful in itself, the motive with which the act was done is, a matter of indifference.

The question was left open in that case, whether it would have made any difference in law if the "hole" had been dug from motives of unmixed malice, and was designed for no purpose of either ornament or use.

A large number of cases are to be found, and some of them are cited for appellee, in which it was held that an owner of an adjoining tract of land by digging thereon cannot divert the water from his neighbor's spring or well, if the digging is done with malice, or with the intent to deprive his neighbor of the water, but they have no application to this case, as it is neither alleged nor proved that the acts of the appellant were done either maliciously or with intent only to deprive appellee of the flow of water to its spring.

The opinion in *Frazier* v. *Brown, supra,* says: "In considering the relative rights and obligations of owners of adjoining lands in respect to water passing from the lands of one to those of the other, the subject naturally divides itself into four branches of enquiry, and this on account of the four different modes in which water may, and sometimes does, pass from one tract to another."

"1. In respect to surface streams, which flow in a permanent, distinct, and well-defined channel from the lands of one owner to those of another.

"2. In respect to surface waters—however originating—which, without any distinct or well-defined channel, by attraction, gravitation, or otherwise, are shed and pass from the lands of one proprietor to those of another."

"3. Subterranean streams which flow in a permanent, distinct, and well-defined channel from the lands of one to those of another proprietor.

"4. Sub-surface waters which, without any permanent, distinct, or definite channel, percolating in mere veins, ooze or filter from the lands of one owner to the lands of another.

"The whole subject, in all of its branches, is governed by two

general and fundamental maxims, which are—first, that the estate, usufruct, and dominion of the owner of lands extends from the sky to the lowest depths of the earth; second, that every man shall so use his own as not to injure his neighbor. These maxims, however, like most general rules, are in their application subject to modifications or exceptions, growing out of certain great principles of natural right, anterior in their origin, and superior in their obligation, to all individual proprietorship; out of certain paramount considerations of public policy; and from the established principles that, however great or obvious the *damage* may be, the law will regard as an *injury* that only which contravenes or interferes with a recognized right."

In the case before us we are only concerned with the fourth branch of enquiry mentioned above, to-wit: Sub-surface water, which, without any permanent, distinct, or definite channel, percolate in mere veins, ooze, or filter from the lands of another.

The bill does allege that there are two springs upon appellee's land supplied with water coming from appellant's land, and which are in fact the only value that the property of appellee has, so that to be in any way deprived of these springs would be practically to be deprived of the property, but as we have already seen, it is not alleged that the water, the obstruction and detention or diversion of which is complained of, reaches appellee's lands from the lands of appellant in any distinct, definite, or known channel, either above or below the surface.

What then is the proof as to the character of the supply of water to the spring alleged to have been destroyed or injured by the acts of appellant?

Much testimony was introduced for appellee to show the conduct of appellant in attempting to obtain the use of the water from the springs, and as to the digging of the ditch along or near the dividing line between the two properties; and its effect upon the smaller of the springs, which is situated about 15 or

16 feet from the dividing line, but very little testimony as to the character of the supply of water to the spring. Instead of showing that the supply of water to the spring is through a distinct, definite, or known channel, the reverse is the effect of the testimony.

C. S. Patterson, president of the appellee company, testifying in its behalf, describes the premises and the ditch dug by appellant, and both he and other witnesses say that the water in the smaller of the springs was so reduced and lowered by the digging of the ditch and the gathering of the water in it, that the water would not run out of the spring. The ditch is described as beginning with the top of the ground and running into the slope of the mountain thirty feet, and of a depth of from 8 to 10 feet, where it stops above the spring. The witness (Patterson) was asked if the water came into the ditch at the point where it stopped, and his answer was: "The water came in along the side and continued on as far as he dug the ditch."

This is practically all the testimony in the record as to the character of the supply of water to the spring in question.

The appellant in his answer says, that he dug upon his own land to obtain water; that he was simply doing what he had a perfect right to do; that he was not seeking to cut off the sources of any spring on appellee's land; that he did not know and could not tell where the water which flowed from appellee's spring came from, but if it be true, as inferred by appellee, that it came from appellant's land, he would certainly be allowed a reasonable use of it, &c. In his deposition he says that he started the digging upon his own land with the view of putting in a pair of steps, but after going in a few feet he struck water, and concluded to open up a spring. That when he discovered there was a prospect for water at that point and began to open it up, he had no intention whatever of cutting the sources of appellee's springs, as he did not know where the sources of the springs were, nor did he intend to injure appellee in any way,

but only intended to add to the value of his own property and to his own comfort.

There is testimony for appellee tending to show that appellant's statement as to why he began the digging on his land was untrue; that there was bad feeling between the parties, and that appellant was actuated by malice in digging the ditch; but it is, we think, irrelevant. The simple question made by the pleading is, Did appellant have a lawful right to do what appellee complains of?

Cooley in his work on Torts (2nd ed.), 689, says: "If one by excavation on his own land draws off the subterraneous waters from the lands of his neighbor to the prejudice of the latter, no action will lie for the consequent damages. This is fully settled in England by the leading case of *Acton* v. *Blundell*, 12 M. & W., 324, and in a later case it is decided that prescriptive rights cannot be gained in subterraneous waters, which will preclude such excavations on adjoining grounds as may draw them off. These decisions have been generally followed in this country, and it may be considered settled law that if the well dug by one man ruins the well or spring of his neighbor by drawing off its water, it is *damnum absque injuria*. Probably if the subterraneous water were a stream flowing in a well-known course it would be different, and one through whose land it flowed would be protected against its being drawn away from him. But one claiming rights in such a stream would be under the necessity of proving its existence and tracing it; not an easy task in any case."

In Gould on Waters (3rd ed.), sec. 280, it is said: "Water percolating through the ground and beneath the surface, either without a definite channel or in courses which are unknown and unascertainable, belongs to the realty into which it is found. The rule that a man may freely and absolutely use his property, so long as he does not directly invade that of his neighbor or consequently injure his clearly-defined rights, is applicable to

the interruption of sub-surface supplies of water or of a stream, and the damage resulting therefrom is not the subject of legal redress. The landowner may, therefore, make a ditch to drain his land, or dig a well thereon, or open and work a quarry upon it, or otherwise change its natural condition, although by so doing he interrupts the underground sources of a spring or well on his neighbor's land. The only remedy for the latter is to sink his own well deeper. He may take the water which would otherwise pass by natural percolation into the adjoining land, or draw off the water which may come by natural percolation from that land, and no adverse right to prevent the exercise of this privilege can be acquired by prescription." * * * *

Among the many authorities cited in support of the text just quoted, is the case of *Wheatley* v. *Baugh,* relied on by appellee's counsel here and reported in 25 Penn. St., 528, and 64 Amer. Dec., 721. It fully sustains the principles stated in the next and not the contention of appellee. It holds that the destruction of a spring depending for its supply in percolation from the land above, by use of the land above for mining or other lawful purposes, will not render the owner liable in damages to the owner of the lower land, whose spring is destroyed, unless the injury was occasioned by malice or negligence.

In a note to the case, 64 Amer. Dec., *supra,* it is said: "Water percolating beneath the surface without a definite channel, or in courses which are unknown and unascertainable, is not subject to the settled law governing the rights of riparian owners." * * * * * *

"Waters which thus appear not to be supplied by a definite flowing stream are presumed to be the result of the ordinary percolations of water in the soil; such a presumption being necessary to obviate the difficulty of determining whether the water flows in a channel. * * * * * Where percolating water is found, it belongs to the realty where it is found."

The rules of law stated in the note are sanctioned by all the

text writers, and among the authorities cited in support of them are the leading cases of *Chasemore* v. *Richards*, 7 H. L. Cas., 349; *Dickenson* v. *Grand Junc. Canal Co.*, 7 Exch., 282; and *Acton* v. *Blundell, supra.*

In *Chasemore* v. *Richards* it was said: "The principles which regulate the rights of owners of land in respect of water flowing in known and different channels, whether upon or below the surface of the ground, do not apply to underground water which merely percolates through the strata in no known channels. Where, therefore, a landowner and a millowner, who had for above sixty years enjoyed the use of a stream which was chiefly supplied by such percolating underground water, lost the use of the stream after an adjoining owner had dug on his own ground an extensive well, for the purpose of supplying the inhabitants of the district, many of whom had no title, as landowners, to the use of the water, the millowner had no right of action, * * * * * * and the principle applies, although the water flows subterraneously in a channel which was, and by excavation could have been ascertained to be definite, if the channel is not absolutely known."

The only difference in the application of the law to surface and sub-surface streams is in ascertaining the character of the stream. If it does not appear that the waters which came to the surface are supplied by a definite flowing stream, they will be presumed to be formed by the ordinary percolations of water in the soil. * * * * A stream or water course consists of bed, banks and water, and to maintain the right to a water course it must be made to appear that the water necessarily flows in a certain direction and by regular channel, with banks or side, and having a substantial existence, but it need not be shown that the water flows continually, as it may be dry at times. *Tampa Water Wks.* v. *Cline,* 37 Fla., 586, 33 L. R. A., 376; *Roath* v. *Driscoll*, 20 Conn., 533.

In *Wheelock* v. *Jacobs*, 70 Vt., 162, 43 L. R. A., 1005, it is

held that a stream of water large enough to fill a five-eighths pipe running through a fissure or hole in the bed-rock several feet below the surface of the ground, but not flowing in a well-defined channel underground, is to be deemed percolating water, which can be appropriated by the owner of the land without liability to the owner of a spring a short distance therefrom, into which some of the water has been accustomed to find its way. See also *So. Pac. R. R.* v. *Dufour*, 19 L. R. A., 92, and authorities cited in foot note to that case.

Subterranean waters can only be the subject of riparian rights when flowing in defined or known channels. "Defined" means a contracted and bounded channel, although the course of the stream may be undefined by human knowledge. "Known" means the knowledge, by reasonable inference, from existing and observed facts in the natural or pre-existing condition of the surface of the ground. "Known" in this rule of law, is not synonymous with "visible," nor is it restricted to knowledge derived from exposure of the channel by excavation. Water percolating through the ground in no defined or visible channel is not a stream." 14 Mews, E. C. L., 1955.

It was said by Lord Watson in *McNab* v. *Robertson*, 1 App. Cas., 134: " The word 'stream,' in its primary and natural sense, denotes a body of water, having, as such body, a continuous flow in one direction.   *   *   *   *   *   *   I see no reason to doubt that subterraneous flow of water may in some circumstances possess the very characteristics of water running on the surface; but in my opinion water, whether falling from the sky or escaping from a spring, which does not flow  onward with any continuity of parts, but becomes dissipated in the earth's strata, and simply percolates through or along those strata, until it issues from them at a lower level, through dislocation of the strata or otherwise, cannot with any propriety be described as a 'stream.' "

In *Roath* v. *Driscoll, supra*, it is said: "Water, whether

moving or motionless in the earth, is not, in the eye of the law, distinct from the earth. The laws of its existence and progress, while there, are not uniform, and cannot be known and regulated. It rises to great heights, and moves collaterally, by influences beyond our apprehension. These influences are so secret, changeable, and uncontrollable, we cannot subject them to the regulations of law, nor build upon them a system of rules, as has been done with streams upon the surface. Priority of enjoyment does not, in like cases, abridge the natural rights of adjoining proprietors."

Another case in which the facts are very similar to the case at bar is *Trustees* v. *Youmans*, 50 Barb., 316, 45 N. Y., 362. In that case the plaintiff owned land in which were two springs which supplied him with water. Adjacent to those, and situated upon a higher slope, was the defendant's land. One of the plaintiff's springs was close to the line of defendant's land, the other about two rods distant from it. The defendant, in order to procure water within his land for his own use, dug a trench therein along the lower border of his land, and in so doing diminished the quantity of water in plaintiff's springs by cutting off some of the underground sources of supply.

In opinions by two of the judges affirming the judgment of the lower court dismissing the plaintiff's complaint, nearly all the authorities bearing upon the question are reviewed, and it was held that the weight of authority clearly sustained the right of the defendant to dig in his own land to obtain water for proper and necessary uses at his house and barn, even if by so doing he materially interfered with the natural flow of water from the springs issuing from the lands of the plaintiff adjoining the defendant's premises; that the question was not whether the plaintiff could maintain an action against the defendant for damages for negligence or want of due care in digging in his land close to the line of plaintiff's land, but was whether the defendant should be restrained from digging in his land, what-

ever his object or motives were, to the injury of the plaintiff's springs. The opinion of Balcom, J., concludes: "If the defendant were liable for digging in his land for water, for domestic or agricultural purposes, near the line of the plaintiff's land, out of which these springs issue, because such digging materially lessened or prevented the flow of water from such springs, then he and all others would be liable for digging for a like proper purpose in their lands, though a half mile from plaintiff's springs, provided such digging would prevent the water issuing from such springs. Such a rule would create more vexation than it would do good, and it might become intolerable. The weight of authority is opposed to such a rule. The decisions in Campbell and Story's Reports (*supra*) and the doctrine of Chancellor Walworth in *Smith* v. *Adams*, 6 Paige, 435, are overborne by the numerous opposing authorities I have cited."

Many of the authorities referred to above and a number of others are cited by Mr. Minor in support of the following text: "Upon considerations of policy, as well of natural right, subterranean streams, whose springs and sources are not known, are not governed by like principles as regulate those which flow over the surface, but they are held rather to fall within the doctrine which gives to the owner of the soil all that lies beneath it, whether it be solid rock, porous earth, or veins of water, so that he may dig therein and apply that which is found there to his own purpose, at his absolute will and pleasure; and if in the exercise of such rights he intercepts or draws off water collected from underground springs in his neighbor's well, the inconvenience of his neighbor falls within the description of *damnum absque injuria*, and is no ground for an action." 3 Minor's Inst. (2nd ed.), 18.

In 27 Amer. & Eng. Enc. L., at page 425, it is said: "The correlative rights of adjoining proprietors in reference to running streams, whether on the surface or subterraneous, and the general principles relating thereto, have no application to un-

defined subterranean waters, which are merely the result of natural and ordinary percolations through the soil; such waters are part of the land itself, and belong absolutely to the proprietor within his territory; and it has been well settled by a long and unbroken line of authority, that a proprietor of land may dig a well, upon his own premises, mine, drain it, or in any way change its natural condition, even though in so doing he may intercept or impede the natural underground percolations, the sources of supply of his neighbor's spring or water. He may as lawfully draw the natural percolations from his neighbor's land as prevent the percolations of his own well going into the well of his neighbor's. Such underground waters are as much the property of the owners of the land as the ores, rocks, etc., beneath the soil." The text is supported by a great number of authorities cited.

In the well reasoned opinion of Lewis, C. J., in *Wheatley* v. *Baugh, supra,* it is said: "When the filtrations are gathered into sufficient volume to have an appreciable value, and to flow in a clearly defined channel, it is generally possible to see it, and to avoid diverting it, without serious detriment to the owner of the land through which it flows. But percolations spread in every direction through the earth, and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land. Accordingly, the law has never gone so far as to recognize in one man the right to convert another's farm to his own use, for the purposes of filter. Such a claim, if sustained, would amount to a total abrogation of the right of property. No man could dig a cellar or a well, or build a house on his own land, because these operations necessarily intercept the filtrations through the earth. Nor could he cut down the forest and clear his land for the purposes of husbandry, because the evaporation which would be caused by exposing the soil to the sun and air would inevitably diminish to some extent the supply of water which would otherwise filter through it. He could not

overturn a furrow for agricultural purposes, because this would, partially, produce the same result. Even if this right were admitted to exist, the difficulty in ascertaining the fact of its violation, as well as the extent of it, would be insurmountable."

There is respectable authority, and several of the cases are cited for appellee, seemingly in conflict with those we have referred to above, but they are cases in which the facts and circumstances were very different from those in this case. They are cases in which the stream in question, though subterranean, was well defined, and came more properly under the rules of law applicable to surface water, or in which the acts complained of were done maliciously, or with the sole purpose on the part of one landowner to deprive another landowner, his neighbor, of the supply of water to his spring or well. In this case, if appellant had dug a well on his own land for the purpose of obtaining a supply of water for his own use, the result of which was to dry up the spring on appellee's land, it would not be contended that appellee would have had a cause of action against appellant for so doing. It is also unnecessary to cite authority for the proposition that if the supply of the spring in question is by a well-defined stream of water coming from the lands of appellant, though sub-surface, he would be entitled to a reasonable use of the water on his own land.

The water did not come into the ditch dug by appellant in a stream of any size or character, but, according to appellee's principal witness: " The water came in along the side, and continued on as far as he dug the ditch." In other words, the water percolated or filtered into the ditch along its side its whole length—thirty feet. Whether, if it appeared that the supply of the spring was through a well-defined channel, which could have been preserved without detriment to appellant's property through which it flowed, as well as the question whether, if the interference with the sources of the spring was attributable to malice or negligence, are questions not before us.

We are unable to see, from the evidence in the case, that appellant has been guilty of any act beyond the lawful use of his own property, and are, therefore, of opinion that the decree appealed from must be reversed and annulled, and this court will enter such decree as the Circuit Court ought to have entered, dismissing appellee's bill.

*Reversed.*