# Staunton.

## CLINCHFIELD COAL CORPORATION V. COMPTON.*

September 22, 1927.

Absent, Prentis, P.

1. INSTRUCTIONS—*Partial View of the Evidence—Opposing Theories Should Both be Presented—Single Instruction.*—Where there are opposing theories of a case, each supported by evidence adequate to support a verdict, each party is entitled to have his theory presented to the jury by a proper instruction of the court. This should be done in such manner as not to confuse or mislead the jury, preferably by a single instruction propounding both theories.

2. INSTRUCTIONS—*Partial View of the Evidence—Opposing Theories Should Both be Presented—Two or More Instructions.*—But if, when the instructions are submitted to the court, it appears that each theory is clearly and fully set forth, though in separate instructions, and the jury understand the issue submitted to them, that in one view of the case they are to find for the plaintiff and in another for the defendant, the omission of a complete statement of the case in a single instruction becomes harmless.

3. INSTRUCTIONS—*Partial View of the Evidence—Opposing Theories Should Both be Presented—Case at Bar.*—In the instant case, an action by a landowner against a coal company for destroying a spring, defendant assigned as error the giving of an instruction for plaintiff to the effect that if the jury believed that defendant mined coal in and under plaintiff's land without leaving sufficient support to prevent the overlying strata of the coal from breaking and falling so as to injure the spring and as a result thereof the spring was destroyed, they should find for the plaintiff, without modifying the instruction to show that defendant was not liable for draining a spring issuing from a coal seam which defendant owned and had the right to remove, and also was not liable for draining a spring supplied by underground percolations or seepages in defendant's own land.

*Held:* That while it was true that the instruction in question was objectionable as presenting only plaintiff's theory of the case, yet the instruction was harmless because three other instructions, given

---

*NOTE.—See *Couch* v. *Clinchfield Coal Corporation,* post, page 455, 139 S. E. 314.

for the defendant, equally propounded defendant's theory, and no jury of average intelligence could have been misled by the fact that the opposing theories were presented in four instructions instead of one.

4. Waters and Watercourses—*Percolating Waters—Definition.*—Percolating waters are those which ooze, seep, or filter through the soil beneath the surface, without a defined channel, or in a course that is unknown and not discoverable from surface indications without excavation for that purpose. The fact that they may, in their underground course, at places come together so as to form veins or rivulets does not destroy their character as percolating waters.

5. Waters and Watercourses—*Percolating Waters—Water Following Cracks in Strata of Sandstone.*—Water which has fallen upon a mountain side and sunk into the earth, and which has followed the seams and cracks in the strata of sandstone of which the mountain is composed is percolating water, and its character as such is not altered by the fact that at one place it breaks through the sandstone, forming small springs, which without a defined channel, or current, find their way into a stream.

6. Waters and Watercourses—*Underground Water—Knowledge of Existence of Underground Stream—When Rules the Same for Underground Waters as for Streams Upon the Surface.*—If the underground water flows in a stream with a well defined channel, and its existence, location and course is known or knowable from external facts, then the same rules apply as if the stream were upon the surface. The distinction between rights in surface and subterraneous streams is not founded on the fact of their location above or below ground, but on the fact of knowledge, actual or acquirable, of their existence, location and course.

7. Waters and Watercourses—*Percolating Waters—Underground Streams—Knowledge of Existence and Location of Underground Streams.*—Not only those waters which ooze or percolate through the soil are subject to the law of percolating waters. The waters may flow in a well defined channel and be such as if on the surface would answer the description of a watercourse, but in order to be subject to the law of surface water, the existence, location and flow of the water must be known to the owner of the land through which it flows, or it must be discoverable from the surface of the earth. This knowledge of the existence of the stream must arise by reasonable inference, from existing and observed facts in the condition of the surface of the ground and cannot be derived from a discovery in part by excavation exposing the channel.

8. Waters and Watercourses—*Underground Waters—Presumption that Underground Water is Percolating Water.*—Unless it is shown that the underground water flows in a defined and known channel it will be

presumed to be percolating water. This presumption it is difficult to overcome, but the burden is on him who alleges that the water flows in a known and defined channel to overcome this presumption by affirmative proof to the contrary.

9. WATERS AND WATERCOURSES—*Underground Waters—Ascertainability of Existence of Underground Stream.*—The existence of an underground stream, which the owner of the surface has no right to divert, may be indicated in several ways. Thus surface depressions extending in a line on either side of a spring of considerable volume may give notice of the existence of an underground stream. So the existence on the surface of a line of vegetation usually found nowhere except over watercourses indicates an underground stream. So, also, a stream which sinks into the ground and continues under ground for a considerable distance and then reappears, but whose course and direction distinctly appears on the surface, is an underground stream between the points where it appears on the surface.

10. WATERS AND WATERCOURSES—*Underground Stream—Knowledge of Existence—Evidence—Scientific Opinion—Burden of Proof.*—In order to charge the owner of the surface with liability for disturbing the flow of an underground stream, its existence, location and flow must in some way be made to appear from the surface of the earth; and the appearance must be such only as would be reasonably discoverable by men of ordinary powers and attainments. No resort to scientific opinion is necessary. The burden of proof lies upon the plaintiff claiming the right to the underground stream.

11. WATERS AND WATERCOURSES—*Underground Stream—Percolating Waters—Case at Bar.*—The instant case was an action by a landowner against a coal company for the destruction of a spring on plaintiff's land. The coal company owned in fee a large boundary of land and also the coal underlying the land of the plaintiff. The surface boundary line between the land of plaintiff and that of defendant ran through the spring, which was dried up. Defendant claimed that the spring was fed by percolating waters from its land, and that the spring was dried up by seams and cracks on defendant's own land, which cut off the percolating waters. Plaintiff contended that what was cut off was not percolating water, but an underground stream. The water issued from a seam of coal on land of which defendant owned both the surface and the underlying coal, which it had a right to mine. There was no evidence of the existence of a stream or watercourse, and no effort was made to show the location of the alleged stream before it emerged from the seam of coal.

*Held:* That the water which was cut off from the spring was percolating water.

12. WATERS AND WATERCOURSES—*Percolating Water—Liability for Diversion—Case at Bar.*—The instant case was an action by a landowner

against a coal company for the destruction of a spring on plaintiff's land.  The coal company owned in fee a large boundary of land and also the coal underlying the land of the plaintiff.  The surface boundary line between the land of plaintiff and that of defendant ran through the spring in question which was dried up.

*Held:*  That it did not follow that because the water was percolating, there could be no liability on the coal company.  Liability is dependent upon the location of the point of interception of the supply.  If the percolating water was on the land of the plaintiff and was there cut off by the removal of the subjacent support, to which the plaintiff was entitled, then the coal company was liable.

13.  MINES AND MINERALS—*Lateral and Subjacent Support—Owner of Surface Entitled to Subjacent Support.*—Whether the surface is reserved by the grantor of the underlying coal, or is granted to one and the underlying coal to another, in either event, the owner of the surface is entitled to subjacent support from the owner of the coal.

14.  MINES AND MINERALS—*Subjacent Support—"Surface."*—"Surface" includes whatever of earth, soil, land, or waters, which lies above and is superincumbent upon the coal, and is not limited to the mere geometrical superficies.

15.  WATERS AND WATERCOURSES—*Percolating Water—Underground Waters—Action for Destruction of Spring—Case at Bar.*—The instant case was an action by a landowner against a coal company for the destruction of a spring on plaintiff's land.  The coal company claimed that the cracks which cut off the supply of water from the spring were on its own land, where it owned both the surface and the underlying coal; that the spring was on the surface line between it and the plaintiff, on the side of the mountain; that it owned all of the land above the spring; and that the percolating water was cut off on its own land by a legitimate use of its own property.  The coal company's position was supported by the evidence.  No effort was made to show that the coal company had any knowledge or means of knowledge of the course of the water that formerly came from under the seam, even if the water could be dignified by the name of a stream, or watercourse, which the court thought it could not be.·

*Held:*  That the waters which fed the plaintiff's spring were percolating waters; that they were cut off or intercepted by the legitimate mining operations of the coal company on its own land, and if, in consequence thereof, the plaintiff has sustained damage, it is *damnum absque injuria.*

16.  REAL PROPERTY—*Estates—Fee Simple Owner—Rights Above and Below the Surface—Underground Waters—Common Law Rule.*—The common law regarded the fee simple owner of the land as the owner of everything above and below the surface from the sky to the center of the earth, expressed in the maxim, *Cujus est solum, ejus est usque*

*ad coelum et ad inferos,* and this doctrine is adhered to in England. Under this doctrine, the owner of the land may make any use he pleases of underlying percolating waters, and may even cut them off maliciously without liability to his neighbor.

17. REAL PROPERTY—*Estates—Fee Simple Owner—Rights Above and Below the Surface—Underground Waters—American Rule.*—The earlier American cases followed the common law doctrine, but the trend of modern opinion is in favor of the "reasonable use" rule which has come to be called the American rule. The "reasonable use" rule does not forbid the use of the percolating water for all purposes properly connected with the use, enjoyment and development of the land itself, but if does forbid maliciously cutting it off, its unnecessary waste, or withdrawal for sale or distribution for uses not connected with the beneficial enjoyment or ownership of the land from which it is taken.

18. WATERS AND WATERCOURSES—*Underground Waters—American and Common Law Rules—Case at Bar.*—In the instant case, an action by a landowner against a coal company for the destruction of a spring on plaintiff's land, the coal company was making a legitimate use of its land for mining purposes, and even under the American or "reasonable use" rule as to percolating waters was not liable to plaintiff. Therefore the Supreme Court of Appeals was not called upon to decide between the American rule and the common law rule as to percolating waters, and should the question again come before the court it would feel free to consider it *de novo.*

Error to a judgment of the Circuit Court of Dickenson county, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*W. H. Rouse* and *John W. Flannagan, Jr.,* for the plaintiff in error.

*J. C. Smith* and *A. A. Skeen,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

Compton brought an action of trespass on the case against the Clinchfield Coal Corporation, alleging that

he was the owner of twelve acres of land in Dickenson county, and that the coal company carelessly and negligently removed the coal underlying the land without leaving sufficient pillars and props to constitute the necessary subjacent support of the overlying surface, "thereby and by reason of which the overlying strata of rock became and was broken, and the overlying surface undermined and caved in, and by reason of which plaintiff's springs and streams of water were suddenly drained and dried up, thereby depriving said plaintiff and his family and tenants aforesaid of their supply of water for their domestic uses aforesaid. And the surface and soil of the plaintiff was broken and caved in."

During the progress of the trial the plaintiff, without objection from the defendant, abandoned all claim to damages for injury to the surface of his land, "leaving only his claim for damages for draining and drying up his springs."

No damage was shown to have been occasioned except for the loss of one spring.

The defendant pleaded the general issue and the statute of limitations, and stated in writing its grounds of defense. There was a trial by jury, and a verdict in favor of the plaintiff for $2,000.00, which the trial court refused to set aside, but entered judgment thereon. To that judgment a writ of error was awarded by one of the judges of this court.

There are three assignments of error, as follows:

I. The court erred in giving plaintiff's instruction number one without modifying same so as to show that defendant, this petitioner, was not liable for draining a spring issuing from a coal seam which it owned and had the right to remove, and also was not liable for

draining a spring supplied by underground percolations or seepages in its own land.

II. The court erred in not sustaining defendant's motion to set aside the verdict of the jury and entering judgment for the defendant.

III. The court erred in entering judgment for the plaintiff.

[1–3] The court gave four instructions for the plaintiff and five for the defendant, to none of which was there any exception, except No. 1 for the plaintiff. This instruction is obnoxious to the objection made to it,—that is, it directs a verdict for the plaintiff upon a partial view of the evidence, which has been repeatedly held to be error. *New York, etc., R. Co.* v. *Thomas,* 92 Va. 606, 24 S. E. 264; *Norfolk, etc., Co.* v. *Aetna, etc., Co.,* 124 Va. 221, 98 S. E. 43; Burks Pl. & Pr. (2d ed.), page 496, note 15. It is based solely upon the evidence for the plaintiff, supporting his theory of the case, and ignores all evidence supporting the defendant's theory. Where there are opposing theories of a case, each supported by evidence adequate to support a verdict, each party is entitled to have his theory presented to the jury by a proper instruction of the court. *Richmond, etc., Co.* v. *Gordon,* 102 Va. 498, 46 S. E. 772. This should be done in such manner as not to confuse or mislead the jury, preferably by a single instruction propounding both theories. But if, when the instructions are submitted to the court, it appears that each theory is clearly and fully set forth, though in separate instructions, and that the jury understand the issue submitted to them, that in one view of the case they are to find for the plaintiff and in another for the defendant, the omission of a complete statement of the case in a single instruction becomes harmless. If the instruction complained of had been the only in-

struction given on the subject there would have been
much force in the objection, but instructions are to be
read as a whole, and the jury should be so informed;
and if, when so read, it can be seen that the jury could
not have been misled or confused, their verdict will
not be disturbed because of a failure to state the
complete case in a single instruction. *Va. Car. C. Co.
v. Knight,* 106 Va. 674, 56 S. E. 725; *Ches. & O. Ry. Co.
v. McCarthy,* 114 Va. 181, 76 S. E. 319; *Higgins v.
Whitmore,* 116 Va. 414, 82 S. E. 180; *Whealton &
Wisherd v. Doughty,* 116 Va. 566, 82 S. E. 94; *Towson v.
Towson,* 126 Va. 640, 650, 102 S. E. 48; *A. C. L. R. Co.
v. South Oil Mills,* 129 Va. 323, 330, 106 S. E. 337.

In the instant case, while instruction No. 1 given
for the plaintiff propounded only his history of the case,
instructions Nos. 1, 2 and 3, given for the defendant,
equally propounded its theory, and no jury of average
intelligence could have been confused or misled by the
fact that the opposing theories were presented in four
instructions instead of one. Counsel on each side
would be astute to present their theories, and to point
to the instructions presenting them.*

The other assignments of error involve the rights and

---

*Instruction No. 1 for the plaintiff*

The court instructs the jury that it was the duty of the defendant in
mining and removing the coal under the tracts of land set out in the plain-
tiff's declaration, to leave sufficient pillars, props, or other means of sup-
port to prevent the strata overlying the coal from breaking and falling 'so
as to injure the plaintiff's spring,' and if they believe from a preponderance
of the evidence that the defendant mined the coal in and under the plain-
tiff's land described in the declaration without leaving sufficient pillars,
props, or other means of support to prevent the overlying strata of said
coal from breaking and falling 'so as to injure said spring' and that as a
result thereof the said strata was broken and the springs on said tracts of
land thereby drained and destroyed, they should find for the plaintiff such
damages as he has sustained by reason of the draining and drying up of
said springs.

*Instructions Nos. 1, 2 and 3 for the defendant*

No. 1. The court instructs the jury that the defendant company in
the mining and removal of its coal had the right under the law to drain
underground percolations or streams of water in the soil over or around its
seam of coal, although said percolations or streams may supply the spring

duties of parties with respect to underground waters, where one of the parties owns the surface and the other the underlying minerals.

The coal company owned in fee—surface and underlying minerals—a large boundary of land, and also the coal underlying the land of the plaintiff. The plaintiff owned the surface of two small parcels of land, one acre and eleven acres, respectively, and the surface boundary line between the lands of the plaintiff and that of the defendant ran through "the head of the spring," which was dried up. The spring was on the side of the mountain, not far from the "top of Sandy Ridge." The defendant claimed that the spring was fed by water which percolated from its land, which lay above the spring, and that the spring was dried up by seams and cracks on its own land, which cut off the percolating waters. Counsel for Compton, on the other hand, contend that what was cut off was not percolating water, but a living stream, and "concede that there is no liability upon the part of the defendant for the destruction of percolating water, whether the same runs through the defendant's coal seam or elsewhere." Thus a sharp issue is raised between the parties as to the source of supply of the spring, and it becomes necessary for us to decide what constitutes percolating water.

of another, and if you believe that springs were fed or supplied by percolations or seeps you will find for the defendant as to said springs.

No. 2. The court instructs the jury that the defendant had the right to mine and remove the coal from all seams of coal on the eleven and one acre tracts above the road, and if you believe from a preponderance of the evidence that the spring or springs alleged in the declaration had their origin in the seam of coal, or coal bank, described in the evidence, and would have been or would be destroyed in the mining and removing of the coal therefrom, then you shall find for the defendant as to said springs.

No. 3. The court instructs the jury that unless the plaintiff by the preponderance of the evidence shows that said spring or springs came from a distinct known, or well defined underground stream, or a well defined channel on the surface, then the defendant was not required to make any effort to protect same in the mining and removal of its underlying coal, and as to said springs you will find for the defendant.

The coal company introduced no testimony on the subject of the nature of the supply of the spring, but relied entirely upon the testimony offered by the plaintiff. There is no evidence of the existence of a stream or water course consisting of a bed, banks and water. The water issued from a seam of coal on land in which the defendant owned both the surface and the underlying coal, which it had the right to mine, and traversed the land of the defendant about twenty feet, causing "a kind of wet place," or seep, to a point on the line between the plaintiff and the defendant where a place was dug out and a box inserted to hold the water which constituted the spring in controversy. It was a well supplied, never failing spring.

Underground waters are classified as (1) streams or bodies of water existing in known and well defined channels, and (2) percolating waters.

[4, 5] Percolating waters are those which ooze, seep, or filter through the soil beneath the surface, without a defined channel, or in a course that is unknown and not discoverable from surface indications without excavation for that purpose. The fact that they may, in their underground course, at places come together so as to form veins or rivulets does not destroy their character as percolating waters. *Wheelock* v. *Jacobs*, 70 Vt. 162, 40 Atl. 41, 67 Am. St. Rep. 659; 27 R. C. L., page 1168. Water which has fallen upon a mountain side and sunk into the earth, and which has followed the seams and cracks in the strata of sandstone of which the mountain is composed is percolating water, and its character as such is not altered by the fact that at one place it breaks through the sandstone, forming small springs, which, without a defined channel or current, find their way into the stream. *Gould* v. *Eaton*, 111 Cal. 639, 44 Pac. 319, 52 Am. St. Rep. 201.

[6] It is not so important, however, to accurately define percolating waters. Most of our subterraneous waters are percolating. The important inquiry is what underground waters are governed by the same rules of law that apply to waters that are confessedly percolating. If the underground water flows in a stream with a well defined channel, and its existence, location and course is known or knowable from external facts, then the same rules apply as if the stream were upon the surface.

"The distinction between rights in surface and subterraneous streams is not founded on the fact of their location above or below ground, but on the fact of knowledge, actual or acquirable, of their existence, location and course, and the courts endeavor, so far as practicable, to apply the rules of law applicable to surface streams or bodies of water existing in well defined channels to the like streams or bodies underground." 27 R. C. L., page 1170, section 90.

[7] It is a mistake, however, to suppose that only those waters which ooze or percolate through the soil are subject to the law of percolating waters. They may flow in a well defined channel and be such as if on the surface would answer the description of a water course, but in order to be subject to the law of surface water, the existence, location and flow of the water must be known to the owner of the land through which it flows, or it must be discoverable from the surface of the earth. Otherwise, no one could with safety make excavations on his own land. Furthermore, "the knowledge required cannot be reasonably held to be that derived from a discovery in part by excavation exposing the channel, but must be knowledge by reasonable inference, from existing and observed facts in the natural or rather preexisting condition of the surface

of the ground. The onus of proof lies, of course, on the plaintiff claiming the right, and it lies upon him to show that, without opening the ground by excavation, or having recourse to abstruse speculation of scientific persons, men of ordinary powers and attainments would know, or could with reasonable diligence ascertain, that the stream, when it emerges into light, comes from, and has flowed through, a defined subterranean channel." *Black* v. *Ballymena Commrs.*, 17 L. R. Ir. 459; *Wheatley* v. *Baugh*, 25 Pa. St. 528, 64 Am. Dec. 721; *Tampa Water Works Co.* v. *Cline*, 37 Fla. 586, 20 So. 780, 33 L. R. A. 376, 53 Am. St. Rep. 262; *Collins* v. *Chartiers Valley Gas Co.*, 131 Pa. St. 143, 18 Atl. 1012, 6 L. R. A. 280, 17 Am. St. Rep. 791; *Gould* v. *Eaton*, 111 Cal. 639, 44 Pac. 319, 52 Am. St. Rep. 201.

[8] It is well settled that unless it is shown that the underground water flows in a defined and known channel it will be presumed to be percolating water. *Gould* v. *Eaton, supra; Tampa Water Works Co.* v. *Cline*, 37 Fla. 586, 20 So. 780, 33 L. R. A. 376, 53 Am. St. Rep. 262; *Barclay* v. *Abraham*, 121 Ia. 619, 96 N. W. 1080, 64 L. R. A. 255, 100 Am. St. Rep. 365. There are many other cases to the same effect. See citations 27 R. C. L., page 1170, note 15. This presumption it is difficult to overcome, as in a great majority of cases the exact condition or course of the underground water is not known, nor readily ascertainable, but the burden of proof is on him who alleges that the water flows in a known and defined channel, and he must lose unless he can overcome the presumption by affirmative proof to the contrary. Note, 67 Am. St. Rep. 670–71, citing cases.

[9, 10] The ascertainability, from surface indications, of the existence of an underground stream is

illustrated by some of the cases. Surface depressions or sinks extending in a line on either side of a spring of considerable volume may give notice of the existence of an underground stream which the owner of the surface has no right to divert. *Tampa Water Works Co.* v. *Cline, supra.* Also the existence on the surface of a line of vegetation usually found nowhere except over watercourses. *Hale* v. *McLea,* 53 Cal. 578. So, also, a stream which sinks into the ground and continues under ground for a considerable distance and then reappears, but whose course and direction distinctly appears on the surface, is an underground stream between the points where it appears on the surface. *Saddler* v. *Lee,* 66 Ga. 45, 42 Am. Rep. 62. See also *Whetstone* v. *Bowser,* 29 Pa. St. 60; *Wheatley* v. *Baugh, supra; Case* v. *Hoffman,* 84 Wis. 438, 54 N. W. 793, 20 L. R. A. 40, 36 Am. St. Rep. 937. In order to charge the owner of the surface with liability for disturbing the flow of an underground stream, its existence, location and flow must in some way be made to appear from the surface of the earth; and the appearance must be such only as would be reasonably discoverable by men of ordinary powers and attainments. No resort to scientific opinion is necessary.

[11] In the instant case, no effort was made to show the location or course of the alleged stream before it emerged from the seam of coal, and, if it were necessary to show the conditions for the twenty feet between the seam and the spring, we have no difficulty in finding that there was no stream between the coal seam and the spring. It is true that some of the witnesses speak of the water flowing into the spring in a stream, but it is manifest that there was no stream with bed and banks between the coal seam and the head of the spring. The distance was only about twenty feet, and it was

"a kind of wet place there," spoken of as a "seep," and the water trickled out from the coal seam. "Some of the time a little water oozed out all along, but the main stream was at the head of the spring." The spring was made by digging back into the bank and inserting a box in which the water accumulated. The spring was a "kind of dugout place." The water after leaving the spring something over one hundred yards, again sank into the rocks and sand. The water which was cut off from the spring was percolating water, and it is plain that it was cut off by the cracks caused by the manner in which the coal company mined its coal.

[12–14] But it does not follow that because the water was percolating, there could be no liability on the coal company. Liability is dependent upon the location of the point of interception of the supply. If the percolating water was on the land of the plaintiff and was there cut off by the removal of the subjacent support, to which the plaintiff was entitled, then the coal company is liable. Whether the surface is reserved by the grantor of the underlying coal, or is granted to one and the underlying coal to another, in either event the owner of the surface is entitled to subjacent support from the owner of the coal. "Surface" includes whatever of earth, soil, land, or waters which lies above and is superincumbent upon the coal, and is not limited to the mere geometrical superficies. This is just what was decided, after careful consideration and the citation of authorities, in *Stonegap Colliery Co.* v. *Hamilton*, 119 Va. 271, 89 S. E. 305, Ann. Cas. 1917E, 60. See also *Horner* v. *Watson*, 79 Pa. 242, 21 Am. Rep. 55; 27 Cyc. 789–90, and cases cited. If the water had been cut off by the removal of the support underlying the plaintiff's surface, the coal company would have been liable, but such was not the case.

[15] The coal company claims that the cracks which cut off the supply were on its own land, where it owned both the surface and the underlying coal; that the spring was on the surface line between it and the plaintiff, on the side of the mountain; that it owned all of the land above the spring; and that the percolating water was cut off on its own land by a legitimate use of its own property. This position is supported by the evidence. When the spring went dry, there was no water left there. There is no evidence that any water thereafter came from under the coal seam, and no effort was made to show that the coal company had any knowledge, or means of knowledge, of the course of the water that formerly came from under the seam, even if it could be dignified by the name of a stream, or water course, as we think it could not be.

Upon the authorities cited, we are of opinion that the waters which fed the plaintiff's spring were percolating waters; that they were cut off or intercepted by the legitimate mining operations of the coal company on its own land, and if, in consequence thereof, the plaintiff has sustained damage, it is *damnum absque injuria.*

[16] Decided cases contain interesting discussions of the relative rights and duties of adjacent owners in respect to percolating waters. Among the more recent is *Rouse* v. *Kinston*, 188 N. C. 1, 123 S. E. 482, 35 A. L. R. 1203 (June, 1924), citing a number of the previous cases. The common law regarded the fee simple owner of the land as the owner of everything above and below the surface from the sky to the center of the earth, expressed in the maxim, *Cujus est solum, ejus est usque ad coelum et ad inferos*, and this doctrine is adhered to in England. *Acton* v. *Blundell*, 12 Mees & W. 324, 13 L. J. Exch. 289; *Chasemore* v. *Richards*,

7 H. L. Cas. 349. Under this doctrine, the owner of the land may make any use he pleases of underlying percolating waters, and may even cut them off maliciously without liability to his neighbor.

[17] It is said that the earlier American cases followed this doctrine and some of them still do, but that the trend of modern opinion is in favor of the "reasonable use" rule which has come to be called the American rule. 27 R. C. L., page 1171, section 91. The "reasonable use" rule does not forbid the use of the percolating water for all purposes properly connected with the use, enjoyment and development of the land itself, but it does forbid maliciously cutting it off, its unnecessary waste, or withdrawal for sale or distribution for uses not connected with the beneficial enjoyment or ownership of the land from which it is taken. *Barclay* v. *Abraham*, 121 Ia. 619, 96 N. W. 1080, 100 Am. St. Rep. 365, 64 L. R. A. 255; *Pence* v. *Carney*, 58 W. Va. 296, 52 S. E. 702, 112 Am. St. Rep. 963, 6 L. R. A. (N. S.) 266, 6 Ann. Cas. 285. The "American rule" takes cognizance of the maxim, *Sic utere tuo ut alienum non laedas*, and treats it as a reasonable limitation upon the maxim, *"Cujus est solum."* It gives to the owner of the soil every reasonable use of the water, but forbids him to use otherwise, his rights to the prejudice of his neighbor. The basis of the "American rule" is well expressed by Chancellor Pitney in *Meeker* v. *East Orange*, 77 N. J. L. 623, 74 Atl. 379, 25 L. R. A. (N. S.) 465, 134 Am. St. Rep. 798, as follows: "This does not prevent the proper user by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation, or otherwise; nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with

or diverted; but it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it thereby result that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs, or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses." See also, *Forbell* v. *New York*, 164 N. Y. 522, 58 N. E. 644, 51 L. R. A. 695, 79 Am. St. Rep. 666; *Katz* v. *Walkinshaw*, 141 Cal. 116, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35; *Stillwater Co.* v. *Farmer*, 89 Minn. 58, 93 N. W. 907, 60 L. R. A. 875, 99 Am. St. Rep. 541; *Rouse* v. *City of Kinston, supra;* 27 R. C. L., pages 1171-2, sections 91, 92, 93 and 94, and cases cited.

*Miller* v. *Black Rock Spring Co.*, 99 Va. 747, 40 S. E. 27, 86 Am. St. Rep. 924, is an ideal case of percolating water, and its interception was for domestic purposes, which was authorized on any theory of the case; but the English theory of the absolute ownership of percolating water was there approved. It was said, however, in the course of the opinion, that whether there would be liability on the defendant if cutting off the supply of percolating water was attributable to malice or negligence on the part of the defendant was a question not before the court. The facts of that case did not necessitate a choice between the English and the "American rule" as the interception of the water was warranted by either. That case was quoted with approval in *Heninger* v. *McGinnis*, 131 Va. 76, 108 S. E. 671, for the proposition that the owner of the surface is owner of the underlying percolating waters.

Here, again, the doctrine of "reasonable use" was not involved.

[18] In the instant case, the coal company was making a legitimate use of its land for mining purposes, even under the "reasonable use" rule, and we are not called upon to decide between the different theories, but if the question shall again come before this court we shall feel free to consider it *ne novo*.

Having arrived at the conclusion that the water, in the instant case, was percolating water, and that the coal company was not liable for its interception, it becomes unnecessary to pass on the question of the statute of limitations raised by the defendant.

The judgment of the trial court will be reversed, the verdict of the jury set aside, and final judgment will be entered by this court for the plaintiff in error, and for its costs.

*Reversed.*