# Richmond

## C & W COAL CORPORATION v. BETTY LOU SALYER.

June 16, 1958.

Record No. 4804.

Present, Eggleston, Spratley, Buchanan, Miller, Whittle and Snead, JJ.

The opinion states the case.

*Leslie M. Mullins* (*Greear, Bowen, Mullins & Winston,* on brief), for the plaintiff in error.

*Kenneth P. Asbury* (*Asbury & Roberson,* on brief), for the defendant in error.

MILLER, J., delivered the opinion of the court.

An action at law was instituted by Betty Lou Salyer, hereinafter called plaintiff, against C & W Coal Corporation to recover damages for the destruction of a spring on her property in Wise county,

Virginia, allegedly caused by strip or open-pit coal mining carried on by the corporation on adjoining lands.

Upon submission of the case to the jury, a verdict for $1,500 damages was returned for plaintiff, and from a judgment confirming that verdict we awarded the corporation an appeal.

In the motion for judgment it is alleged that when the corporation mined coal on lands adjoining plaintiff's property, it knew or should have known of the existence of the spring on plaintiff's land, but nevertheless it "negligently and carelessly cut the streams of water which supplied the" spring and thereby caused it to become dry.

During the trial no proof was offered that the corporation "negligently and carelessly" caused any damage to plaintiff's spring, and the charge of negligent and careless infliction of damage is not now relied upon. Plaintiff, however, contends that the evidence proved that a freestone spring on her premises was fed by an underground stream of water flowing in a defined channel, which was known or should have been known to the corporation and that this stream was broken, cut or diverted in the mining operations and her spring caused to become dry.

The chief assignments of error challenge the sufficiency of the evidence to support the verdict.

On April 19, 1950, plaintiff acquired from her husband, Johnny C. Salyer, 5.81 acres of land with a four-room residence thereon where she, her husband and children have since lived. When this land was purchased by plaintiff, no freestone water supply or spring was known to be on the premises. Though sulphur water was available on the land, yet it is not palatable for it has an objectionable odor. Nor is it desirable for domestic use, for it discolors utensils, food and fabrics when used for cooking and laundering. Prior to discovery of the spring, water for drinking and household use was obtained elsewhere and hauled to plaintiff's home.

In 1951, while erecting a fence on plaintiff's land to keep cattle out of a swamp, Johnny C. Salyer observed water boiling up out of a post hole he was digging. Further excavation at this spot where it was moist and the grass was greener than elsewhere disclosed a freestone spring of considerable volume coming out of a bowl-shaped rock. In 1953, he built a reservoir around the spring and extended a pipe line to the residence. An abundant supply of water for use of the family of five flowed through the pipe from the reservoir to the residence by force of gravity. The spring also

furnished an ample supply of water for several head of stock and domestic fowls on the small farm, and it flowed in undiminished volume even in dry weather.

The C & W Coal Corporation was engaged in strip or open-pit coal mining on lands adjoining plaintiff's farm on the south and southeast. In this character of mining, dynamite blasts of varying force and intensity are put off at times, and pits or excavations of considerable depth are made to shatter rock formations and to expose and expedite removal of the coal. To reach the coal top soil is first removed and the stratum or seam of coal nearest the surface is mined. If there be more than one stratum of coal in the area mined, then the subsoil above the second stratum is removed, and that seam of coal exposed and mined. Necessary blasting and the removal in sequence of each successive level of soil and rocks encountered so as to expose a lower seam of coal is usually pursued so long as the coal may be profitably mined. When the actual mining operations are completed, the subsoil and top soil are often replaced and the excavations leveled off.

On the lands adjoining plaintiff's property there were three strata of coal, which are identified by local names. The Blair Seam, 42 inches thick, was exposed by removal of a layer of top soil varying in depth from 15 to 50 feet. After that seam of coal had been exposed and mined, another 43-foot layer of earth was removed by the corporation to uncover the Lyon Seam, 37 inches thick. Upon removal of that coal, another layer of earth about 25 feet thick was removed and the Glamorgan Seam exposed and mined. Some of the mining operations were carried on and pits sunk within 250 to 300 feet of plaintiff's property line and about 500 to 600 feet distant from her spring.

Though the natural surface of the area mined was rugged and more elevated than plaintiff's 5.81 acre tract of land, yet the excavations made to mine the lowest stratum of coal carried the pits in places 10 to 15 feet lower than the surface level of plaintiff's land and spring.

Evidence showed strata of coal being mined on lands near plaintiff's property slanted downward in a northwesterly direction toward plaintiff's premises, and two or more witnesses, experienced in mining operations, said that underground water flowed with the slant of the strata of coal.

The blasts of dynamite put off from time to time by the corpora-

tion had the effect of dislodging the rock and soil, and exposing the strata of coal being mined. One witness testified that the excavations and dynamite blasts shattered, destroyed, and diverted all streams of water in the mined area to the depth of the pits, but he was not advised what effect it had below the level of operations.

On September 15, 1954, between eleven o'clock a.m. and noon, a dynamite blast was heard by plaintiff from the corporation's mine nearby, the intensity and effect of which are described by her as follows:

"Q. Do you recall when your spring quit running?

"A. Yes, sir, I recall when my spring quit running.

"Q. When was it?

"A. The shot was fired on the 15th of September, approximately the time between eleven and twelve in the morning.

"Q. Before the shot was put off did you have plenty of water?

"A. Yes, I had all the water and more than I needed for my family.

"Q. Had the flow ever diminished or cut down any?

"A. No.

\*       \*       \*       \*       \*       \*       \*

"Q. Describe what happened on the day the spring went dry.

"A. I had two older children and the baby at the time. The baby was asleep and the two older children out playing. I was going about doing my house work when a shot was fired, and the whole house lifted, and the small objects in my windows, "what-nots" they fell out and light things like calendars on a small tack, they come off the hooks and fell in *in* the floor; glasses in my cabinet turned all over; and the children that were out playing came in scared to death, one of them crying and the other scared just as bad.

"Q. Where did that shot come from?

"A. Well, there was so much dust—it come from the C & W strip job.

"Q. After that shot did anything happen to your water? If so, what?

"A. In approximately two hours to three, I didn't have no water in the house.

"Q. Have you ever had water from that spring since then?

"A. No, sir, I haven't."

Other testimony showed that the corporation was aware of the existence of plaintiff's spring before it was caused to become dry, but it insists that though the mining operations may have destroyed the spring, yet the principle of *dammum absque injuria* applies. We are reminded that all underground water is presumed to be percolating water until the contrary is made to appear.

"It is well settled that unless it is shown that the underground water flows in a defined and known channel it will be presumed to be percolating water." *Clinchfield Coal Corp.* v. *Compton*, 148 Va. 437, 448, 139 S. E. 308. *Miller* v. *Black Rock Springs Improvement Co.*, 99 Va. 747, 40 S. E. 27; *Pence et al.* v. *Carney et al.*, 58 W. Va. 296, 52 S. E. 702; 20 M. J., Waters and Watercourses, § 8, p. 29; 56 Am. Jur., Waters, § 103, p. 586; 93 C. J. S., Waters, § 87, p. 762; 55 A.L.R. 1386; 109 A.L.R. 397.

Relying upon this presumption, it is asserted by the corporation that (a) the evidence is insufficient to prove that the spring was fed by a subterranean stream as distinguished from mere vagrant, fugitive, percolating waters that seep and filter through the earth beneath its surface, and (b) if it be conceded that the spring was fed by a live subterranean stream as distinguished from water that seeps and filters through the strata of earth, yet plaintiff has failed to prove that the corporation knew or should have known from external evidence that there was a subterranean stream flowing in a well defined channel to plaintiff's spring from the area where it was mining. It is then asserted that in the absence of such knowledge or evidence appearing on the surface of the terrain from which it might be reasonably concluded that the spring was fed by a subterranean stream flowing in a well defined channel from the mined area to the spring, the water is subject to the law applicable to percolating waters, and no liability in the absence of negligence, attaches to the corporation for diverting or cutting the underground stream while engaged in its mining operation.

"Underground waters are classified as (1) streams or bodies of water existing in known and well defined channels, and (2) percolating waters.

"Percolating waters are those which ooze, seep, or filter through the soil beneath the surface, without a defined channel, or in a course that is unknown and not discoverable from surface indications without excavation for that purpose. The fact that they may, in their

underground course, at places come together so as to form veins or rivulets does not destroy their character as percolating waters. * * *

\* \* \* \* \* \* \*

"* * * In order to charge the owner of the surface with liability for disturbing the flow of an underground stream, its existence, location and flow must in some way be made to appear from the surface of the earth; and the appearance must be such only as would be reasonably discoverable by men of ordinary powers and attainments.* * *" *Clinchfield Coal Corp.* v. *Compton, supra,* at pages 446, 449.

"There must be a certainty of the location as well as of the existence of a subterranean stream before it is proved to be an underground stream rather than percolating water." 109 A.L.R. 415.

"In most of the cases dealing with the subject, questions as to liability for the incidental obstruction or diversion of a subterranean stream in the use of one's own property have been made to depend primarily upon whether the existence and course of the stream are known or ascertainable from surface indications. If so known or ascertainable, liability is determined, ordinarily, by the rules applicable in the case of surface streams; but if unknown or unascertainable, by the rules applicable in the case of percolating waters." 29 A.L.R. 2d 1373.

Though subterranean water flows in a channel or vein, yet it is considered and treated as percolating water and subject to the same legal principle so far as the rights of land owners are concerned when the course of the underground stream or vein is unascertained or unknown and not reasonably discoverable from the condition and physical aspects of the surface. 29 A.L.R. 2d 1374, 1375.

"It is a mistake, however, to suppose that only those waters which ooze or percolate through the soil are subject to the law of percolating waters. They may flow in a well defined channel and be such as if on the surface would answer the description of a water course, but in order to be subject to the law of surface water, the existence, location and flow of the water must be known to the owner of the land through which it flows, or it must be discoverable from the surface of the earth. Otherwise, no one could with safety make excavations on his own land. Furthermore, 'the knowledge required cannot be reasonably held to be that derived from a discovery

in part by excavation exposing the channel, but must be knowledge by reasonable inference, from existing and observed facts in the natural or rather preexisting condition of the surface of the ground. The onus of proof lies, of course, on the plaintiff claiming the right, and it lies upon him to show that, without opening the ground by excavation, or having recourse to abstruse speculation of scientific persons, men of ordinary powers and attainments would know, or could with reasonable diligence ascertain, that the stream, when it emerges into light, comes from, and has flowed through a defined subterranean channel.' " *Clinchfield Coal Corp.* v. *Compton, supra,* at page 447.

The strata of coal in the mined area slanted toward plaintiff's tract of land, and the water encountered in the seams of coal flowed in that direction. Yet there is no evidence to prove that any of the underground streams that were cut were confined to a well defined channel. And there is but little proof, if any, that they were other than percolating waters when they reached plaintiff's premises if they flowed to her tract of land. The fact that the spring dried within a few hours after a somewhat severe dynamite blast was set off on adjacent property tends to show that water was diverted that would have reached plaintiff's spring. It is, however, clearly insufficient to prove that the corporation knew before it excavated and cut the flow of water, or from surface indications should have reasonably known of the existence of a stream flowing from the area of its operations in a well defined channel to plaintiff's spring or premises if such a stream did in fact exist below the surface.

It follows that the judgment appealed from must be reversed.

*Reversed and final judgment.*