Edwin HARRIS, Dorothy Harris, Rivermont Village, Inc., James B. Crismon and C. L. Furry, Appellants,

v.

CHAS. PFIZER & CO., Inc., Appellee.

No. 18709.

United States Court of Appeals
Eighth Circuit.

Dec. 5, 1967.

Samuel Richeson, of Dearing, Richeson, Weier & Roberts, Hillsboro, Mo., for appellants and filed brief.

W. Stanley Walch, Thompson, Mitchell, Douglas & Neill, St. Louis, Mo., for appellee, William G. Guerri and Edwin D. Akers, Jr., and Jean J. Thyson, St. Louis, Mo., were on the brief.

Before BLACKMUN, GIBSON and LAY, Circuit Judges.

LAY, Circuit Judge.

This case involves the conflicting claims of owners in surface rights and owners of mineral interest in the same land. An appeal is taken from the granting of a permanent injunction restraining the subdivision, platting and selling of residential or building lots on a 6,002 acre parcel of land known as the Kingston Claim in Washington County, Missouri. Appellants were further restrained from constructing dams and lakes on the land as well as from any development of commercial facilities which would interfere with appellee's mineral rights in the land. Appellants contend the decree below is erroneous in two basic particulars: (1) in holding that the grantee of the mineral rights is not liable to appellants under a lease-sale for damage to structures or improvements erected subsequent to 1945 (the date of the lease) by reason of appellee's mining operation; and (2) in finding sufficient evidence to support the ruling (a) restricting appellants' use of the entire property and (b) restricting such use permanently without consideration to appellants' rights in the land after the ore is exhausted. We affirm.

The common source of title for both interests in the Kingston Claim is the Washington Land and Mining Co. Appellants purchased their surface interest from Washington Land and Mining Co. in 1963. Appellants' deed was expressly made "subject to" mineral and mining rights conveyed in 1945. Appellee-Chas. Pfizer & Co., Inc. (hereinafter Pfizer) acquired by a lease-sale agreement certain mineral rights in May 1963. Its predecessors leased the interest in March 1945, with rights, ultimately exercised by appellee, to acquire the mineral rights by warranty deed.

Essentially, the Pfizer deed incorporated the terms of the lease, which conveyed to Pfizer's predecessor the following property and rights:

1. Title to all of the "barytes or tiff now or at any time hereafter" located on the Kingston Claim;

2. Extensive rights to utilize the surface for washer sites, mud ponds and storage facilities which can be used for processing minerals extracted from the Kingston *or from other properties;*

3. Incidental rights of ingress, egress, and the right to construct roads, railroads, power lines and the like; and finally,

4. The exclusive right (except on the Mineral Fork River) to capture, impound and dam all water on the Kingston Claim.

The lower court held that these rights constituted the "dominant estate," and that appellants "may use the surface of the Kingston Claim for agriculture, forestry and grazing purposes, but the use by [appellants] is subject to [appellee's] right to use and to *destroy* the surface of the land." (Emphasis ours.)

In 1965 the individual appellants formed Rivermont Village, Inc., for the purpose of developing residential subdivisions and a recreational lake on the Kingston Claim. They engaged in extensive advertising of the lots for sale, and the evidence shows that a total of eight building lots have been sold at various places on the Kingston Claim by the Harrises and by Rivermont Village for a total consideration of $12,750.00. The deeds to these lots reserved or excepted mineral rights, but did not specifically refer to barite or to any restrictions with respect to improving said lots. The appellants platted two subdivisions, known as the "Rivermont Village Estates" and the "Timber Ridge Lake Estates," the latter of which is platted around a proposed artificial lake created by an earthen dam, which at the time of the trial was already partially completed. In addition to the lake, appellants also cleared an air strip to serve the Timber Ridge Lake Estates.

Barite is mined by either the "open cut" or "strip" methods.[1] The evidence discloses that both procedures involve the scooping up of earth directly from and below the surface of the land and dumping the same into large power trucks which transport the material to a "washer," which then separates the barite ore from the clay and earth. Great quantities of water used in the washing process, along with the waste materials are channeled into large mud ponds upon the surface of the land near the washer. Either method completely destroys the surface of the land and necessitates the removal or destruction of any improvements located thereon. Because the washing process requires great quantities of water, the appellee Pfizer emphasizes its right to exclusive use of the surface waters on the Kingston Claim (with the exception of the Mineral Fork River), and thus asserts that a proposed dam and artificial lake of the appellants would constitute an improper invasion of appellee's rights.

CONSTRUCTION OF LEASE

The 1945 mineral lease, under paragraph 6, obligated the lessee (appellee's predecessor) to pay the lessor damages if in the process of mining operations they "impair or interfere with use by Lessor of any roads, structures or improvements. * * *" The trial court construed this to mean *"existing* roads, residential structures, the grove, the orchard and permanent pasture areas contained in the survey." (Emphasis ours.)

Pursuant to paragraph 10 of the lease, a survey was made identifying the permanent pasture area then existing. According to this provision of the lease, damages to this area were restricted to the first twenty years of the lease. The district court observed:

"In interpreting the Mineral Deed and the 1945 lease, it is clear from the terms of these instruments that dam-

ages for improvements were to be paid only for interference with the then existing roads, residential structures, the grove, the orchard and permanent pasture areas contained in the survey. Damages for crop lands and pasture lands were limited to $50 an acre for bottomlands and $10 an acre for hill land, and only in the lands included in the survey. Damages were not contemplated for improvements after the expiration of the lease, which has now expired."

■■ Under the law of Missouri the "rule to be observed in the construction of deeds * * * is to ascertain the intention of the grantor, and to give effect to such intention, unless it conflicts with some positive rule of law. It is necessary to take the deed as a whole in arriving at such intention and not to give any clause in the instrument undue preference." Triplett v. Triplett, 332 Mo. 870, 60 S.W.2d 13, 15 (1933); Lloyd v. Garren, 366 S.W.2d 341, 345 (Sup.Ct.Mo. 1963). To adopt appellants' interpretation and award compensation for damage to all "improvements," including those placed on the land since 1945, would obviously result in the diminution or outright extinction of the exercise of the mineral rights by making mining prohibitive in cost, thereby defeating the dominant estate. Appellants' interpretation *is clearly repugnant with the main* purpose of the lease, that is, the right to strip mine and destroy the land. Cf. Kinney-Coastal Oil Co. v. Kieffer, 277 U.S. 488, 505, 48 S.Ct. 580, 72 L.Ed. 961 (1928).

■ We feel the district court made it clear that no ambiguity existed and his construction of the instruments was "plain from the face of the lease and deed." It is true that the trial judge allowed parol testimony as to the intention of the parties, but it is well within his discretion to do this in a trial to the court. And we have held many times

---

1. The only difference between the open cut and strip methods is that in the strip method an "overburden" of non-ore-bearing top soil is first removed and laid aside to reach the ore-bearing clay located below, and the barren top soil is not taken to the washer.

that unless the contrary appears, "[i]n the trial of a case to the court without a jury, the presumption is that the trial court considered only competent evidence and disregarded all evidence which was incompetent." Montgomery Ward & Co. v. Steele, 352 F.2d 822, 830 (8 Cir. 1965); Manning v. Jones, 349 F.2d 992, 996 (8 Cir. 1965); Thompson v. Baltimore & O. R. R., 155 F.2d 767, 771 (8 Cir. 1946).

We find no error in the trial court's construction of the lease.

## THE INJUNCTION

■ It has long been recognized in Missouri that mineral rights constitute a separate and distinct interest apart from the surface rights in the land. Wardell v. Watson, 93 Mo. 107, 5 S.W. 605 (1887). Generally, it is understood that where separate estates coexist each should adjust to the other to the extent possible, in order to allow the maximum use and enjoyment of both interests. General Refractories Co. v. Swetman, 303 Ky. 427, 197 S.W.2d 908 (Ct.App.Ky. 1946). Thus, it has been held that the owner of surface interest has the unquestioned right to subjacent support from subsurface mining unless otherwise waived. Clinchfield Coal Corp. v. Compton, 148 Va. 437, 139 S.E. 308, 55 A.L.R. 1376 (1927). It has likewise been recognized that the surface owner has a right of access to strata underlying previously conveyed solid mineral. Pyramid Coal Corp. v. Pratt, 229 Ind. 648, 99 N.E.2d 427, 25 A.L.R.2d 1245, And that the owner of mineral rights has no right to infringe arbitrarily upon another's surface rights. General Refractories Co. v. Swetman, supra. Significantly here, it should be observed that some cases have denied the right of the mineral lessee to "strip mine" unless it is specifically agreed upon since it destroys[2] the surface. See West Virginia-Pittsburg Coal Co. v. Strong, 42 S.E.2d 46 (Va.1947); 19 Wash. & Lee L.Rev. 276. And it is

generally recognized that the surface owner would have the right to the full use of the land after the ore has been extracted. Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597, 18 L.R.A. 702. In contrast, the mineral owner's right includes the exclusive right to explore, Phillips Petroleum Co. v. Cowden, 241 F.2d 586 (5 Cir. 1957); the implied rights of ingress and egress and to occupy the land for mining purposes, Groves v. Terrace Mining Co., 340 S.W. 2d 708, 92 A.L.R.2d 861 (Sup.Ct.Mo. 1960); as well as the implied right to utilize whatever surface land is reasonably necessary for proper use of the mining estate, Gordon v. Million, 248 Mo. 155, 154 S.W. 99 (Sup.Ct.Mo.1913), Kinney-Coastal Oil Co. v. Kieffer, 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961 (1927). Thus, the law has been sensitive to pragmatic recognition of the rights of both parties in construing mineral leases. In the instant case, however, the rights of the appellee exist not by implication but by express provision in the lease and deed executed.

Appellants contend there exists insufficient evidence to bar their use of the entire 6002 acres of the Kingston Claim when at the present time only 50 acres of approximately 200 prospected have been shown to contain barite. But such figures alone fail to tell the story. There was substantial evidence that practically the whole of the Kingston Claim is within the potential of Pfizer's mining operation; use of most of the surface is needed for conducting reasonably efficient operations under the lease and deed.

Evidence demonstrated that prospecting for barite is an expensive process, and that the cost of prospecting the entire Kingston Claim could be well over $100,000.00. Thus, Pfizer claims that it should not be required to predict in advance where the barite will be mined from the Kingston area. Expert testimony was offered indicating that much

2. In the present case the appellee under the deed is given the express right to destroy the surface. In some states there are reclamation statutes providing a duty upon the lessee to replant the stripped area to thus minimize the damage. 19 Wash. & Lee L.Rev. at 280.

of the Kingston Claim area is relatively rich in the valuable mineral.

The district court considered evidence that in order to mine an area the size of a Kingston tract, three to five separate washer operations in as many different locations would have to be established. Each of these, of course, would create a separate mud pond, which from the evidence apparently occupies a very large area. There was testimony that location of the washer sites would depend on future knowledge of the location of the best barite areas. There was testimony suggesting that the valley being developed by appellants as Timber Ridge Lake Estates would be needed as a mud pond site after it is mined out in order to accommodate a washer for that area. In this regard we think the injunction is within reason and controlled by Kinney-Coastal Oil Co. v. Kieffer, supra.[3] See Buchanan v. Watson, 290 S.W.2d 40, 43 (Ct.App.Ky.1956), where the court said:

> "The deed in this case conveyed virtually all rights necessary to carry out the mining of the coal, including a waiver of damages. The reservations of timber and agricultural use in favor of the grantor were to be exercised only insofar as such uses were consistent with the rights conveyed to the grantee. It was obvious that the estate reserved to the grantor was to be subservient to the dominant estate of the grantee. The paramount purpose of the conveyance was to enable the grantee, or his successor in title, to remove the coal from under the surface of this land. The value of the land lay under the surface, not on it."

See also Blue Diamond Coal Co. v. Neace, 337 S.W.2d 725, 727–728 (Ct.App.Ky. 1960).

Appellants complain that the decree permanently bars them from use of the land after the ore is depleted. We do not feel this is the necessary implication of the trial court's action. The court's decree cannot give appellee greater rights than the instruments of conveyance. The court's power was only exercised to prevent appellants' interference with appellee's rights. Appellants may still use the land so as not to interfere with the use of appellee's dominant estate. The burden is on appellants to demonstrate that their activities will not interfere with appellee's mining operations. If at any time it can be demonstrated that appellee's conduct is arbitrary or capricious to the detriment of appellants the court is open to hear such complaint. The evidence does not support this claim at the present time.

The terms of the deed and lease place upon the appellants a difficult burden of justifying use without interference of appellee's rights. The scope of the mineral grantee's interest drastically limits the effective utility of the surface land. Appellee has "the right to erect on said land such washers, crushers, other machinery, buildings and improvements for the mining, processing and storing or treatment of ores, and in such plant may treat ores obtained from other lands as well as ores obtained from the premises hereby leased." Thus, appellee's right to occupy the surface may extend beyond the time of depletion of the barite deposit on the Kingston Claim itself. However, the evidence is clear that appellants purchased their surface rights fully aware of the outstanding dominant interests. As expressed in the deed of trust received May 27, 1963, appellants' interest was "subject to the following: (A) Mineral and Mining Rights conveyed by Special Warranty Deed dated May 2, 1963 from Mercantile Trust Company to C. K. Williams & Co., recorded in Book 124, page 125 in the Office of the Recorder of Deeds of Washington County, Missouri."

Judgment affirmed.

---

3. We feel appellants' distinction of *Kieffer* is without merit. The facts clearly demonstrate that the mineral owners obtained an injunction to bar the surface owner's use of the land as a townsite without proving that all of the area contained oil on the 80 acre tract. Evidence that defendant's structures would interfere with plaintiff's centralized oil operation was deemed sufficient to support the trial court's injunction covering the entire tract. See 1 F.2d 795–797 (D. Wyo.1924).